***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rowell and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award except for modifications made herein. Accordingly, the Full Commission affirms with modifications the Opinion and Award of Deputy Commissioner Rowell.
Plaintiff moved the Full Commission for attorney fees pursuant to N.C. Gen. Stat. § 9788.1. The Full Commission finds that defendants' defense of this case was not without merit and therefore denies plaintiff's motion.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and after the hearing as:
 STIPULATIONS
1. A Pre-Trial Agreement was stipulated into evidence as Stipulated Exhibit #1, reciting:
 a. The parties are subject to and bound by the provisions of the North Carolina Worker's Compensation Act.
b. Key Risk is the insurance carrier for the Employer.
 c. On May 3, 1997, plaintiff was an active member of the North Carolina Army National Guard.
 d. On May 3, 1997, plaintiff was attending annual training at Fort Bragg, NC, as part of her duty as a member of the North Carolina Army National Guard.
 e. The North Carolina Army National Guard determined that plaintiff injured her back in the line of duty during the annual training.
 f. Defendants have denied liability for plaintiff's workers' compensation claim.
 g. If plaintiff is entitled to compensation, her compensation rate is the maximum, $512.00 per week, pursuant to N.C.G.S. § 97-29.
2. The parties stipulated into evidence as Stipulated Exhibit #2, a medical records packet, which by agreement of the parties was submitted subsequent to the date of hearing before the Deputy Commissioner.
 RULINGS ON EVIDENTIARY MATTERS
Defendant's objection to any legal opinions or conclusions expressed by plaintiff's lay witness by deposition, Mr. Gene Dickey, is overruled.
The objections contained within the depositions of Dr. Keith Tucci and Dr. Charles Branch are ruled upon in accordance with the applicable law and the Opinion Award in this case.
 ***********
Based upon all the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 35 years old, had a high school education and was attending Methodist College. On May 3, 1997, plaintiff was an active member of the North Carolina Army Reserve National Guard (the Guard). Plaintiff was otherwise unemployed on May 3, 1997, but for some time she had been attending college and taking courses. During this time and up to the date of hearing before the Deputy Commissioner, plaintiff had taken courses at Sampson County Community College, James Sprunt Community College, and Methodist College. On May 3, 1997 plaintiff was attending annual training at Fort Bragg, North Carolina, as part of her duty as a member of the Guard. Prior to May 3, 1997, plaintiff had had no prior back problems, was the mother of four children, and was actively engaged in many activities.
2. On May 3, 1997, plaintiff was assigned to the Mess section for her annual training, which was responsible for preparation of food for all the troops in the field. Her duties included, among other things, unloading trucks, heavy lifting, carrying heavy items, and digging ditches. These items ranged from ten to seventy-five pounds. Plaintiff had others performing these duties with her, but at times she could be the only person performing these duties. On May 3, 1997, plaintiff's first day of annual training, she finished her duties between 10:00 pm and midnight. The next morning, on Sunday, May 4, 1997, plaintiff got up between 2:30 am and 3:00 am and her legs and back were stiff and sore. Plaintiff continued her duties that day, and as the day progressed her back pain gradually grew worse. Plaintiff finished her duties between 10:00 pin and midnight. The next morning, on Monday, May 5, 1997, plaintiff got up about 2:30 am and her back pain was to the point that she had to ask for help in putting on her shoes. Plaintiff performed her breakfast duties, as best she could, and after breakfast she was allowed to leave the annual training site to attend a class a Sampson County Community College. Plaintiff continued to have pain that night at class and returned to the training site. The next day, on Tuesday May 6, 1997, and the following day, on Wednesday, May 7, 1997, plaintiff kept the same routine, but continued to experience back pain to where it hurt to move her legs. On May 7, 1997, while plaintiff was attending class, her pain grew worse and plaintiff's mother was called to meet her at the emergency room at Duplin General Hospital. Plaintiff presented at the emergency room with lower back pain and was diagnosed with acute lumbar strain. Plaintiff described that she had been lifting heavy equipment with the Guard since May 3, 1997. Plaintiff returned back to the training site and presented the May 7, 1997 Doctor's note to her immediate supervisor, SFC King.
3. On May 9, 1997, plaintiff was sent to a MASH unit and examined by a Guard physician, who determined that plaintiff had a lumbar sprain with right sciatica from heavy lifting, and plaintiff was put on bed rest. On May 11, 1997 plaintiff was allowed to leave the annual training site due to the death of her grandmother and to attend her funeral. Plaintiff did not return back to the annual training site prior to its completion on May 17, 1997.
4. On July 17, 1997 plaintiff presented at the Sampson Regional Medical Center Emergency Room with complaints of pain in her back running down to her legs and thighs. Plaintiff indicated that she had helped her husband to lift a light sheet of tin four days or so earlier. Prior to plaintiff helping her husband to lift this light sheet of tin she had had ongoing back pain, and even her squatting to help lift this sheet of tin she felt pain.
5. On January 28, 1998 plaintiff presented at Duplin General Hospital Emergency Room with lower back pain and right leg pain. Plaintiff indicated that she had injured her back previously in May 1997.
6. On April 8, 1998 plaintiff presented at Duplin General Hospital Emergency Room with lower back pain radiating down to her legs. This April 8, 1998 medical note incorrectly stated that plaintiff had lifted a couch four to five days earlier, when plaintiff had actually pushed a T.V. with rollers on it.
7. On April 14, 1998, plaintiff was seen at Gateway Physicians Group with complaints of back pain, which had started back in May 1997. These complaints of back pain had continued to worsen with pain going into her legs. Plaintiff had problems with sitting and standing, and had pain shooting down to her hips to her knees. On April 15, 1998 an appointment was made for plaintiff to have an MRI of her back. On April 22, 1998, plaintiff was again seen and was still having lots of pain in her back. She also complained that this pain was going down her legs, that she was having difficulty lying down on her back, and that no pain medicine was helping her. On April 24, 1998, plaintiff underwent an MRI of the lumbar spine and was found to have a huge ruptured disc at L5-S1 centrally with significant lumbar stenosis.
8. On April 24, 1998, plaintiff was seen at East Carolina Neurology concerning her severe back pain. It was determined that plaintiff was unable to carry out normal daily activities and was unable to walk secondary to her low back pain. It was also determined that plaintiff would be unable to work until her condition is resolved.
9. On May 4, 1998, plaintiff was seen by Dr. Keith Tucci at Eastern Carolina Neurosurgical Associates and after this examination it was recommended that plaintiff have surgery. On May 12, 1998, Dr. Tucci performed a L5 hemilaminectomy and L5-S1 diskectomy. Following this surgery plaintiff did well for a short period of time but the disc problems recurred in July of 1998. Dr. Tucci operated again on plaintiff on July 30, 1998 for a re-exploration of the disc space for removal of the recurrent ruptured disc. Following this second surgery plaintiff did well for a period of time until she had another occurrence of a ruptured disc at the same level and the same site. Following plaintiff's latest recurrence she was referred by Dr. Tucci to Dr. Charles Branch at Wake Forest University Baptist Medical Center.
10. Plaintiff was first seen by Dr. Branch on September 23, 1998. After plaintiff's examination it was decided to proceed with surgery in an effort to alleviate her back and leg pain. On September 24, 1998, Dr. Branch performed a posterior laminectomy and interbody fusion with bone dowel for fusion of the L5-S1.
11. On September 23, 1999, Dr. Branch determined that plaintiff was at maximum medical improvement and gave a permanent partial rating to her back of twenty percent (20%). Dr. Branch subsequently increased this rating to twenty-seven percent (27%).
12. On August 17, 1998, a determination was made by the Guard that plaintiff during her annual training, beginning on May 3, 1997, had injured her back in the line of duty. In making this August 17, 1998 determination no indication was given concerning whether any other injuries unrelated to plaintiff's May 13, 1997 injury had occurred since that day. Additionally, in making this determination no other medical records were available except plaintiff's February 20, 1996 military physical record.
13. Effective October 31, 1999, plaintiff was given an honorable discharge from the Guard. The reason given for plaintiffs discharge was that she was determined to be medically unfit for retention.
14. Following May 3, 1997 and up to the time of plaintiff's discharge, on October 31, 1999, she had attended Guard drills. Following May 3, 1997 plaintiff continued to take college courses, and at the time of the hearing before the Deputy Commissioner she was attending classes at Methodist College.
15. From May 7, 1997 to April 23, 1998, plaintiff was unable to earn wages due to her compensable disability.
16. Both Drs. Tucci and Branch were of the opinion, and the Full Commission finds as fact, that the initial injury which plaintiff sustained in May of 1997 caused her to start having the kind of disc problems that led to her subsequent surgeries. These subsequent surgeries were a natural consequence of plaintiff's original injury in May 1997. The originating event for plaintiff was her May 1997 injury, and all of the subsequent events were just aggravations of this original injury that ultimately led to the surgical procedures plaintiff underwent.
17. On May 3, 1997, plaintiff sustained a specific traumatic incident of the work assigned resulting in lumbar strain, ruptured discs, chronic back pain, and pain radiating down her legs.
19. As a direct and proximate result of plaintiff's compensable specific traumatic incident of May 3, 1997, all subsequent and medically documented events were aggravations of this original injury and ultimately resulted in plaintiffs surgical procedures.
20. As a direct and proximate result of plaintiff's compensable specific traumatic incident of May 3, 1997, plaintiff was disabled from April 24, 1998, when she was determined unable to work, until plaintiff was determined to be at maximum medical improvement on September 23, 1999.
21. Plaintiff is entitled to have defendant provide all medical treatment necessitated by her May 3, 1997 compensable specific traumatic incident, including all treatment recommended by Dr. Tucci or Dr. Branch. According to Dr. Branch plaintiff still has some persistent intermittent sciatica related to epidural scar, and some chronic nerve injury or dysfunction that is related to her multiple ruptures and surgeries.
22. Plaintiff is capable of performing a sedentary type job, where she is given the flexibility to be able to get up and stand, or to walk around.
 ***********
Based upon the following foregoing stipulations and findings of fact the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On May 3, 1997, plaintiff sustained a specific traumatic incident of the work assigned resulting in injuries to her back. N.C. Gen. Stat. § 97-2(6).
2. As a direct and proximate result of plaintiff's compensable specific traumatic incident of May 3, 1997, all subsequent and medically documented events were aggravations of this original injury, and ultimately resulted in plaintiffs surgical procedures. Starr v. CharlottePaper Co., 8 N.C. App. 604, 175 S.E.2d 342 (1970).
3. As a direct and proximate result of plaintiff's compensable specific traumatic incident of May 3, 1997, plaintiff was disabled form April 24, 1998, when she was determined unable to work, until plaintiff was determined to be at maximum medical improvement on September 23, 1999.
4. Plaintiff is entitled to have defendant provide all medical treatment necessitated by May 3, 1997 compensable specific traumatic incident, including all treatment recommended by Dr. Tucci or Dr. Branch.
5. Plaintiff is entitled to the maximum compensation of $512.00 per week for her May 3, 1997 compensable specific traumatic incident.
6. As a direct and proximate consequence of plaintiff's compensable specific traumatic incident, plaintiff is entitled to temporary total disability compensation at a rate of $512.00 from April 24, 1998 to September 23, 1999.
7. As a direct and proximate consequence of plaintiff's compensable specific traumatic incident, plaintiff is entitled to be paid for her permanent partial disability rating of twenty-seven percent (27%) to her back by defendant. N.C.G.S. § 97-31(23).
8. Plaintiff is entitled to have the defendant provide her with vocational rehabilitation services in order to assist in her efforts at locating suitable employment.
 ***********
Based upon the foregoing findings of Fact and Conclusions of Law, the Full Commission enters the following
 AWARD
1. Defendant shall pay temporary total disability compensation to plaintiff at a rate of $512.00 per week from April 24, 1998 to September 23, 1999. This amount is due and payable and shall be paid in lump sum. This award is subject to a reasonable attorney's fee approved in paragraph #3.
2. Defendant shall pay to plaintiff her permanent partial disability rating of twenty-seven percent (27%) to her back at a rate of $512.00 per week for an eighty-one (81) week period. This amount is due and payable and shall be paid in a lump sum. This award is subject to a reasonable attorney's fee approved in paragraph #3.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation due plaintiff under paragraphs #1 and #2 of this award is approved for plaintiffs counsel and shall be paid directly to plaintiff's counsel.
4. Defendant shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury so long as it tends to effect a cure and give relief or lessen plaintiff's disability. These medical expenses shall include continuing treatment, including treatment recommended by Dr. Tucci or Dr. Branch.
5. Defendant shall provide plaintiff with vocational rehabilitation services in order to assist plaintiff in her efforts at locating suitable employment.
6. Defendant shall pay the costs.
This 12th day of August 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER